

Marian F. Harrison
US Bankruptcy Judge

Dated: 9/11/2014

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

IN RE: )
                             ) **CASE NO. 313-07358**
**BRYAN LEE TACKETT,** )
                             ) **JUDGE MARIAN F. HARRISON**
    **Debtor.** )
                             )
**ROBERT H. WALDSCHMIDT,** ) **ADV. NO. 313-90338**
**TRUSTEE,** )
                             )
    **Plaintiff,** )
                             )
**v.** )
                             )
**SINGLETARY CONSTRUCTION LLC,** )
**AND BERT SINGLETARY, AND** )
**LINDA SINGLETARY,** )
                             )
    **Defendants/Counter-Claimants,** )
                             )
**v.** )
                             )
**ROBERT H. WALDSCHMIDT,** )
                             )
    **Counter-Defendant.** )
                             )

---

## MEMORANDUM OPINION

---

    This matter is before the Court upon the Trustee's complaint for turnover against

Singletary Construction LLC, Bert Singletary, and Linda Singletary (hereinafter collectively

"Singletary") and Singletary's counter-claim against the estate. For the following reasons, which represent the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052, the Court finds that the relief requested in the complaint and in the counter-complaint should be denied.

## I. <u>BACKGROUND</u>

The facts revolve around the construction of five houses. Initially, the debtor bought Lot 53 in the Novadell subdivision in Hopkinsville, Kentucky. The debtor sold Lot 53 and entered into a verbal agreement with Singletary to construct the home, whereby the debtor would reimburse Singletary for all costs associated with the construction and pay a $15,000 contractor's fee. During the construction on Lot 53, Singletary would submit periodic statements to the debtor with supporting invoices, and the debtor would reimburse Singletary for these costs. With regard to Lot 53, there is no dispute that the parties reached an agreement.

The debtor entered into contracts to build houses on three more lots, Lots 63, 65, and 71, and asked Singletary to construct the homes. Unlike the situation with Lot 53, the testimony and evidence presented showed that the parties never reached an agreement on the terms of their arrangement regarding construction on these additional lots. The debtor presumed that the same contractual terms agreed upon for Lot 53 would apply, whereas, Singletary was requesting a larger payment for the work to be done. Despite the parties'

failure to agree on terms, the construction on these lots continued. The debtor requested that Singletary stop sending detailed statements with supporting invoices, so Singletary would verbally request draws to cover costs, the debtor would issue a check, and Singletary would send an invoice stating only the amount paid and for which project. The debtor paid Singletary $705,252 for work done on these three lots. Singletary incurred and/or paid the following charges/invoices for Lots 63, 65, and 71:

| | | |
|---|---|---|
| Lot 63 | $263,853.62 | |
| Lot 65 | $178,763.16 | |
| Lot 71 | <u>$212,962.18</u> | |
| Total: | $655,578.96 | |

The total on Lot 63 includes a contractor's fee to Singletary in the amount of $47,250. With regard to these three lots, the Trustee is seeking turnover of $49,673.04 ($705,252 - $655,578.96) + $47,250 (contractor's fee) for a total of $96,923.04. In their counterclaim, Singletary is seeking $74,581.62

The debtor also agreed to build a house on Lot 50 for Michael and Christy Little (hereinafter "the Littles"). The Littles needed the project to be performed by a builder approved by the Veterans Administration (hereinafter "V.A."). The debtor was not a V.A. approved builder and could not sign the contract. He asked Singletary, who was a V.A. approved builder, to build the house. According to the testimony of Michael Little and

Karen Randels, the Littles' real estate agent, the debtor never gave them a signed copy of a contract, which was required for the Littles to obtain a V.A. loan. After several unanswered requests, Ms. Randels learned that Singletary was actually building the house and was a V.A. approved builder. Ms. Randels drew up a new contract, which the Littles and Singletary signed. The debtor testified that he asked Singletary to sign the original contract document but that Singletary refused. This document did not provide any signature line for Singletary. The closing on Lot 50 occurred in January 2013. The debtor demanded contract management fees and sales fees in the amount of $45,150, but Singletary kept the net proceeds from the sale, which totaled $49,064.02. With regard to Lot 50, the Trustee is seeking turnover of the net profit, $49,064.02.

## II. DISCUSSION

### A. Lots 63, 65, and 71

#### 1. Whether a Contract Existed

Whether the parties reached an oral agreement, i.e., formed an oral contract, is a question of fact. *Frear v. P.T.A. Indust., Inc.,* 103 S.W.3d 99, 105 (Ky. 2003) (citations omitted). "If there is sufficient evidence to show a meeting of the minds even though [one party] denies it, then a court or jury may be justified in finding a contract existed." *George Pridemore & Son, Inc. v. Traylor Bros., Inc.,* 311 S.W.2d 396, 397 (Ky. 1958). "[A]n oral

contract is ordinarily no less binding than one reduced to writing." ***Frear,*** 103 S.W.3d at 105 (citation omitted).

There is no dispute that the parties reached an agreement with regard to Lot 53, but this has no bearing on whether an agreement was reached as to Lots 63, 65, and 71. The proof showed that when the parties entered into the agreement regarding Lot 53, it was meant to encompass the construction of Lot 53 only. At that point, there were no discussions or agreements for construction on future lots. It was only after construction was underway on Lot 53 that the parties began talking about Lots 63, 65, and 71, and the proof showed that the parties never agreed on how Singletary was to be paid or how or if the profits would be divided. The debtor wanted to pay Singletary $15,000 per house as had been done on Lot 53, and Singletary wanted to be paid more. Singletary and the debtor exchanged frequent e-mails but never agreed on any terms. Instead, the parties simply continued moving forward, apparently assuming that the terms would eventually be worked out as each wished them to be. There was no meeting of the minds with regard to Lots 63, 65, and 71, and therefore, there is no contract to enforce.[1]

---

[1]The Statute of Frauds is irrelevant because there was never any agreement, oral or otherwise.

5 - U.S. Bankruptcy Court, M.D. Tenn.

## 2. Whether a Joint Enterprise Existed

Under Kentucky law, "a joint enterprise is 'an informal association of two or more persons, partaking of the nature of a partnership, usually, but not always, limited to a single transaction in which the participants combine their money, efforts, skill, and knowledge for gain, with each sharing in the expenses and profits or losses.'" *Roethke v. Sanger*, 68 S.W.3d 352, 364 (Ky. 2001) (citations omitted). In *Huff v. Rosenberg,* 496 S.W.2d 352 (Ky. 1973), the court enumerated the essential elements of a joint enterprise: "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Id.* at 355 (citation omitted). Regarding the third element, "it is necessary to the relationship that there be a sharing of the profits and losses; though in the absence of an express agreement, the sharing of losses may sometimes be implied from an express agreement to share profits." *Roethke,* 68 S.W.3d at 364 (citation omitted).

The crux of this case is that the parties could not agree on the sharing of profits and losses. In fact, the testimony showed that the parties could not agree on their respective roles. The debtor viewed Singletary as a subcontractor entitled to a set fee, whereas Singletary was expecting more of a partnership and a larger percentage of the profits. Instead of coming to any consensus, the parties continued to plow forward despite the lack of an

agreement.  Accordingly, the Court cannot find that a joint enterprise existed between the debtor and Singletary.


## B.  <u>Inducement to Breach Contract (Lot 50)</u>

Under Kentucky law, one is liable for tortious interference with an existing contract when he wrongfully induces a third party not to perform a contract or enter into or continue a business relationship with another.  ***Carmichael-Lynch-Nolan Advert. Agency, Inc. v. Bennett & Assocs., Inc.,*** 561 S.W.2d 99, 102 (Ky. Ct. App. 1977) (adopting Restatement of Torts).  In essence, to recover under this theory, a plaintiff must prove "(1) the existence of a contract; (2) Defendant's knowledge of this contract; (3) that [Defendant] intended to cause its breach; (4) [Defendant's] conduct caused the breach; (5) this breach resulted in damages to [Plaintiff]; and (6) Defendant had no privilege or justification to excuse its conduct."  ***CMI, Inc. v. Intoximeters, Inc.,*** 918 F. Supp. 1068, 1079 (W.D. Ky. 1995).


The Trustee asserts that Singletary went behind the debtor and induced the Littles to enter into a new contract for Lot 50 even though the debtor already had a contract with the Littles.  The Trustee is seeking the proceeds received by Singletary from the sale of Lot 50.

The debtor was not a V.A. approved builder and needed Singletary, who was, to work on Lot 50. The proof showed that the Littles signed a contract with the debtor on July 9, 2012. The contract states that "[t]his Build Contract is to be executed with American Professional Builders and its Affiliate Company: Singletary Construction, LLC - Clarksville, TN." The contract includes a signature line for the buyers and for the debtor. It does not include a line for Singletary's signature. The debtor testified that Singletary would not sign the contract despite his requests.

The debtor's copy of the contract reflects that he also signed the contract on July 9, 2012. However, Mr. Little and Ms. Randels testified that the debtor did not sign the contract when the Littles signed and that the debtor never provided them with a signed copy. In fact, both testified that after numerous attempts to obtain a signed contract, they learned that Singletary was actually the V.A. approved builder, so Ms. Randels drafted the contract that was signed by the Littles and Singletary. Mr. Singletary testified that a contract with a V.A. approved builder was necessary for Singletary to get the loan to purchase the lot and build on it, and Ms. Randels testified that it was necessary for the Littles to get their V.A. loan. Frankly, the testimony of Mr. Little and Ms. Randels was more credible than that of the debtor, and the Court finds that there was never a valid contract between the debtor and the Littles for which Singletary could induce the Littles to breach.

Case 3:13-ap-90338   Doc 18   Filed 09/12/14   Entered 09/12/14 08:00:48   Desc Main
Document      Page 8 of 11

## C.  The Doctrine of Quantum Meruit

This does not end the analysis of the case.  The remaining issue is whether the doctrine of quantum meruit should be applied to the profits received by the debtor on Lots 63, 65, and 71, and the profits received by Singletary on Lot 50.

The elements of a claim of quantum meruit are:

1. that valuable services were rendered, or materials furnished;

2. to the person from whom recovery is sought;

3. which services were accepted by that person, or at least were received by that person, or were rendered with the knowledge and consent of that person; and

4. under such circumstances as reasonably notified the person that the plaintiff expected to be paid by that person.

*Cherry v. Augustus*, 245 S.W.3d 766, 779 (Ky. Ct. App. 2006) (citation omitted).

Despite the lack of an agreement, the Court finds that the debtor and Singletary contributed to the construction and/or sale of these lots and that equity demands that the parties split the profits equally.  Based on the stipulations and admitted exhibits, the Court makes the following findings with regard to Lots 63, 65, 71, and 50[2]:

---

[2]The proof indicated that Singletary did the majority, if not all, of the work on Lot 50. Regardless, Singletary concedes that under the doctrine of quantum meruit, the debtor would be entitled to half the profits from Lot 50.

**LOTS 63, 65, 71**

| | |
|---|---|
| Sale amounts received by debtor for sale of Lots 63, 65, 71 | $935,000.00 |
| Amount debtor paid Singletary for work on Lots 63, 65, 71 | -$705,252.00 |
| **Equals Net profits received by debtor for Lots 63, 65, 71** | **$229,748.00** |

| | | |
|---|---|---|
| Amount debtor paid Singletary for work on Lots 63, 65, 71 | | $705,252.00 |
| Singletary's invoice total for work on Lots 63, 65, 71 | $655,578.96 | |
| Minus Singletary's contractor fee included in invoices | -$ 47,250.00 | |
| Minus amount paid by owners of Lot 65 | -$  6,500.00 | |
| Equals Singletary's Total Expenses | $601,828.96 | -$601,828.96 |
| **Equals net profits received by Singletary for Lots 63, 65, 71** | | **$103,423.04** |

| | |
|---|---|
| Net profits received by debtor for Lots 63, 65, 71 | $229,748.00 |
| Plus net profits received by Singletary for Lots 63, 65, 71 | +$103,423.04 |
| Equals total net profits for Lots 63, 65, 71 | $333,171.04 |
| Divided in half | ÷ 2 |
| **Equals amount of net profits each party should have received** | **$166,585.52** |

| | |
|---|---|
| Net profits received by debtor for Lots 63, 65, 71 | $229,748.00 |
| Minus amount debtor should have received | -$166,585.52 |
| **Equals amount debtor was overpaid for Lots 63, 65, 71** | **$ 63,162.48** |

| | |
|---|---|
| Amount Singletary should have received | $166,585.52 |
| Net profits received by Singletary for Lots 63,65, 71 | -$103,423.04 |
| **Equals amount owed to Singletary for Lots 63, 65, 71** | **$ 63,162.48** |

**LOT 50**

| | |
|---|---:|
| Net profits received by Singletary for Lot 50 | $ 49,064.02 |
| Divided in half | ÷ 2 |
| **Amount Singletary owes to the estate for half of profits from Lot 50:** | **$ 24,532.01** |

## III.  CONCLUSION

Accordingly, the Court finds that the complaint and counter-complaint should be denied.  Singletary may file a proof of claim in the bankruptcy case in the amount of $38,630.47 ($63,162.48 - $24,532.01).


An appropriate order will enter.


**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**

This Order has been electronically signed.  The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.